Wilson Shields, the father of Banner, at the time of his death was possessed of a number of negro slaves, and in his will directed them and his other personal property to be sold for the payment of his debts, and the education of his children, till the youngest should arrive at the age of sixteen; the surplus to be distributed amongst his children in certain proportions. At the sale or distribution, Banner Shields, the defendant, became entitled to a negro boy, Charles, then about ten years of age. He and his brothers agreed between themselves, that, if the slaves which had been the property of their father should behave well, they would each emancipate those they had got, at the age of thirty-one or thirty-two. When Charles was near thirty years of age he absconded from the service of his master, who suspected that his absence was with the knowledge of Reuben Charles. This suspicion probably was not without foundation, from the circumstance of this case, and from the character given of him by all the contending parties. In this situation, Shields agreed to sell the negro for $250, about half his value, and Charles to take his chance of getting him; on condition, he, Charles, would give security for that sum, and a day was appointed to meet in Maryville for that purpose. Charles applied to Cunningham, the complainant, to be his surety; who agreed, provided he would procure one other good man to join him. On the 6th of March, 1813, a *Page 45 
bond was executed to Shields, by Charles, with Cunningham and Harris sureties, for the payment of $25) for the negro on the 12th of August next following. And Shields gave a bill of sale for the negro as a slave for life. On this bond suit was afterwards brought, and prosecuted to judgment. At the date of the bond, Charles was possessed of considerable property, real and personal; bus after suit and before the judgment he was obliged to run away on account of his crimes. Cunningham has filed this bill to be relieved from this judgment, and charges that the negro was sold as a slave for life, when he was entitled to his freedom in a short time. He also charges that Shields procured Harris to become surety under a private contract between themselves, that Harris was in no event to be liable; but that he, Shields, would collect the whole from Charles and Cunningham; and that they thus fraudulently combined together to defraud him, and to induce him to sign the bond, which he would not otherwise have done. Shields, in his answer, insists that the negro is a slave for life; and, from the production of his father's will with the testimony given on the cause, the fact appears to be so. Therefore this ground of equity must be abandoned, nor have the counsel insisted on it. He also denies any private agreement with Harris to exonerate him, or to induce the complainant to be surety; but that the execution of the bond was of his own free will and accord, and at the request of Charles. The evidence is, that he agreed to be one of the parties, provided another was procured, and shortly afterwards stated publicly that in some difficult circumstances of his own Charles had been his surety, and he could not refuse him. Admitting the alleged agreement between Shields and the other surety to be as stated in the bill, is he entitled to relief? It is understood that the injunction has heretofore been dissolved, *Page 46 
and one moiety of the judgment has been collected from each of the sureties. The object is now to have that sum refunded. I do not think him entitled to this relief. He has paid no more than by his contract he was bound in equity to do, and what he voluntarily agreed to risk if Charles should fail. And whether Shields did or did not release the other moiety afterwards to Harris can not affect his liability. I am also induced to think that at the time he signed the bond he intended to dispute the payment: for on the very side of the sale, or before the parties had ail separated, one of his own witnesses deposed that he said to Shields that he had fixed himself for selling a free negro. Prom this circumstance it appears as probable that Charles and Cunningham had combined to overreach Shields, as that Shields and Harris had privately agreed to defraud Cunningham. Fraud, to be relieved against, must be operative. It is not sufficient to say that an act was done with fraudulent intent. It must in its effects be injurious to the party complaining, otherwise he is not entitled to relief. Suppose, in this case, the facts to be as stated in the bill, Cunningham's liability will be the same as it would have been if Shields and Harris had acted with the most upright intentions. In either case, the whole debt might have been collected from him, and Harris could have been compelled to make a proportional contribution. In short, every advantage which he would have had is secure for Harris, as far as respects him, as absolutely and unconditionally bound. This bill must be dismissed. It is unnecessary here to say any thing respecting the answer of Harris, the other defendant, for the substance of it is contained in a bill filed by him against Shields, to be relieved against the other moiety of the judgment (which it is understood he also has paid since the dissolution of the injunction). In the bill he insists on the same ground, of the slave's *Page 47 
being entitled to his freedom at a certain age, to which the same answer will apply, as in the former suit. He also insists that he became surety at the request of Shields, who agreed with him not to require the payment of one cent from him, but to seek payment for the other obligors. Shields, in his answer, denies the fact of any such private agreement. That there was some agreement that Harris should be favored respecting the payment may be inferred from the testimony of Trippett, to whom it appears that Shields made such proposal, and offered an indemnifying bond. But this he did not communicate to Harris till after the execution of the bond in question. After judgment, Trippett heard Shields say at one time, if Harris had confessed judgment at the first court he would not have made him pay anything. At another time he said, if they had confessed judgment at the first court be would not have been so tight on them; and gave as a reason that perhaps he might have got his pay of Charles. George Roulstone went with Harris to see Shields, and in conversation on the subject, Harris said what he had done was through confidence in Shields. It was to befriend him in what he, Shields, had done. Shields answered that Harris had befriended him much; and if he had not threatened him with the gallows he would not have done as he did. It is from this testimony that the inference is drawn that there was some agreement or understanding that Harris was not, at least in the first instance, to be pressed for payment. But on obstacles being thrown in the way of a speedy recovery, so as a chance might have been had to secure payment out of Charles' property, the sureties were then pressed for payment by execution. That obstacles were attempted to be interposed to delay a recovery may be inferred from Harris' bill, wherein he appears to justify himself by alleging that a confession of judgment was no *Page 48 
part of the agreement. The testimony of Roulstone is only that Shields said if it had not been for a certain circumstance named he would not have done as he did. But it will not amount to a confession that he had made any agreement beforehand to that effect. The answer of Shields to Trippett's observation will not be of much greater force; to-wit, that if he had confessed judgment at the first court he would not have made him pay anything; especially when he gives as a reason that in that event he might have got his pay of Charles. And certainly if a man executes a bond under such an agreement as is here alleged there is a tacit condition annexed that he will not attempt to delay a recovery, and thus lessen the chance of payment from his principal. Fraud, to set aside a solemn contract, under seal, ought to be very clearly and distinctly proved, and he who would avail himself of it ought to come before the Court with pure and clean hands. For what purpose did the complainant become a surety in the bond? He says to befriend Harris. How so, if by agreement he was to pay nothing? Was the bond under such circumstances, any better to Shields with his name to it than without it? No; but worse, as Shields might eventually lose a moiety by indemnifying him against his co-surety; for what purpose then does he allege he executed the bond? To befriend Shields by inducing Cunningham to become a surety; that is, in other words, he comes into this court, and avows that he combined with Shields in an attempt to defraud Cunningham by inducing him to believe he had a co-security, who by this statement was only nominal. Will this Court believe him in an allegation of this kind? We say no. This court will not interpose; and decree the money to be refunded, but leave Harris to pursue his remedy at law in the suit which it is admitted is there depending. I omit taking notice of the agreement alleged in the bill, and *Page 49 
denied in the answer that Shields would purchase the property at sheriff's sale, and return it but failed. There is no proof to that effect, and from the bill itself it appears that no sale had taken place at the time it was filed.
This bill must also be dismissed. The costs in each case to be paid by the complainant.